[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case presents a factual pattern that is all too familiar. First of all, the case has been bifurcated and the court is only dealing with the first three counts of the plaintiff's amended complaint dated January 4, 2001. The remaining three counts of the amended complaint and the counterclaim must wait for another day.
The plaintiff, a physician in his late fifties and married, met the defendant, a then married, twenty-eight year old nurse trainee, in a casual, unplanned evening out at a local movie theater in March of 1997. They began seeing each other regularly and their encounters became sexual almost immediately. They would stay in local motels for their trysts under a false name supplied by the plaintiff.
By early June, they were talking about getting a permanent place for their meetings for a variety of reasons. The plaintiff testified that his wife became aware of the relationship, ordered him out of the house, and he needed a place to stay. There was testimony that the defendant was unhappy and fearful for her safety living at her husband's home and the plaintiff wanted to protect her. The court can circumstantially provide another reason which is that both were tired of meeting in sleazy motels and the plaintiff had the wherewithal to provide something better.
Whatever the reason or reasons were, the parties began looking at CT Page 13468-bt places as early as June of 1997. Some time in October of 1997, they agreed upon a property known as Unit 121, The Gardens of Summerfield in Shelton, Connecticut. The plaintiff did all the negotiations for the purchase and a price of $255,000 was agreed upon and become the contract price. The defendant paid the $1,000 binder on the deal with money supplied to her by the plaintiff who was out of the country at the times Upon his return, he paid the balance of the deposit of $24,500 when the contracts were signed on October 8, 1997.
The plaintiff negotiated a mortgage in the full amount of the purchase price, $255,000, with his broker, Merrill Lynch. He testified he intended to take title in his name from the beginning, but when confronted with the fact that such a situation would be printed in local newspapers, he concluded that would certainly stir up his wife's anger and he needed another solution. His mortgage with Merrill Lynch required that the premises be owner-occupied. The plaintiff needed the entire relationship and transaction to be confidential. He spoke with and sought the advice of his attorney, Foster Young, and his accountant, Michael Jelormine, who both suggested that title be taken in the name of a person he trusted, who would live there and who would at the closing of title immediately quitclaim the property back to the plaintiff. He chose his young paramour, the defendant, Sandra Garcia. The plaintiff obviously needed this protection because the defendant was still married, and this could potentially become an asset of her estate and, as the plaintiff stated, the defendant was much younger than him and could leave at any time.
The closing took place on December 5, 1997, and title to the condominium was taken in her name alone. She alone signed the mortgage deed to Merrill Lynch. Because there was a ten percent deposit and a mortgage for the full purchase price of $255,000, there was a check to balance to the buyer Sandra Garcia in the amount of $20,961.59. She immediately endorsed the check over to the plaintiff. At the closing, she also executed a quitclaim deed to the premises back to the plaintiff. Linda Young, a paralegal in Foster Young's law office, identified plaintiff's exhibit A as a copy of the part of the quitclaim deed that she prepared and the defendant signed. The copy was on 8" x 11" paper while the original quitclaim was on 8" x 14" paper. What was essentially missing from the copy was the acknowledgment. The plaintiff apparently left the closing with the quitclaim deed which he kept at the condominium either in a desk or his briefcase depending on whom you want to believe. He obviously did not record it for that would have destroyed its confidential nature. As of that moment, the plaintiff had paid for everything and everything was wonderful, as it usually is at the CT Page 13468-bu beginning.
The defendant moved into the premises full time while the plaintiff still continued to live at home although he was probably at Unit 121 much of the time. He had his lover, his nest, his privacy and his peace of mind. But, alas, the romance was over by June or July of 2000.
In the interim, the plaintiff completely furnished the unit, spent $25,000 completing the downstairs area and reimbursed the defendant for taxes and common charges. It is clear that he paid all the freight, which he appeared willing to do.
This case would be easy to decide if it were not for the fact that the quitclaim deed disappeared and each party presents a totally different scenario for its nonexistence which the court will deal with shortly. The simple fact is there was no quitclaim deed to record when the romance terminated, and the defendant till this day remains the sole title holder and occupant.
The legal principles in this case are also simple. The plaintiff in the First Count of the ended Complaint seeks a declaratory judgment determining the rights of the parties to the condominium and in the Second Count to impose a resulting trust in favor of the plaintiff. Each count is premised upon the specific allegations in paragraph 11 of both counts stating that "the defendant, Sandra Garcia, holds legal title to the Condominium Unit as a trustee under a resulting trust in favor of the Plaintiff, Anton Chinniah. The Third Count sounds in Unjust Enrichment. The defendant claims that at some time, either on the closing date of December 5, 1997, or during their relationship over the next two and a half years but no later than May of 2000 "when she claims the plaintiff tore up the quitclaim deed, that he gifted the condominium to her. Because of the court's conclusions as to counts one and two, the court will not determine the issues as to count three.
A brief discussion of the law of the case would now be beneficial. A resulting trust arises by operation of law at the time of a conveyance when the purchase money for property is paid by one party and legal title is taken by another. It arises to enforce presumed or inferred intent usually in the absence of any element of fraud. The presumed intent for which the law infers a trust may be rebutted by proof of a contrary intent. Spatola v. Spatola, 4 Conn. App. 79, 82 (1985). In deciding whether the property was wrongfully appropriated or retained and what the intent of the parties was at the time of the conveyance, the court must rely upon its impression of the credibility of the witnesses. Intent is a CT Page 13468-bv question of fact, the determination of which is not reviewable unless the conclusion drawn by the trier is one which could not reasonably be drawn. Lord v. Stavrakis, 6 Conn. App. 161 (1986).
The court concludes that at least as of December 5, 1997, when title first passed to Sandra Gardia, she was holding the premises in trust for the plaintiff pursuant to the resulting trust principle. There is no evidence to support a gift to her at that time.
During the first several months of their joint occupancy, the plaintiff made several payments of interest and principal on the mortgage and on June 12, 1998, he paid off the balance of the mortgage in the amount of $213,356.81 with a loan from Merrill Lynch secured by a pledge of securities. Both parties had keys to the condominium and free access to it when ever they wanted. For a period of time, the defendant had her mother move in and live with her. The better evidence is that the plaintiff paid all the expenses associated with the upkeep of Unit 121 until at least I late June of 2000. The defendant offered no evidence as to any expense she paid during this period of time. During their relationship, the defendant completed her nursing degree and became fully employed at Bridgeport Hospital as an intensive care nurse. Coincidentally, that was the same hospital in which Dr. Chinniah had his privileges.
During the two and a half years of their relationship, it ebbed and flowed like any other relationship. Apparently for the first year, everything was reasonably good. The defendant became pregnant although the pregnancy was eventually terminated by an abortion. By 1999, the plaintiff believed that the defendant was having a relationship with another doctor although that has not been supported by an evidence. The defendant on the other hand was becoming weary of the plaintiff's controlling nature, his possessiveness and constant visits and phone calls. By 2000, she testified she felt like a prisoner at Unit 121, but despite that, she never moved out of the premises — either permanently or temporarily. There is no question that as of April 1, 2000, the status of the condominium ownership had not changed although the relationship was coming apart. In the court's opinion, the resulting trust was still in effect and there was no evidence of any donative intent to gift the property to the defendant. The quitclaim deed was alive and well and there was no reason to believe the plaintiff could not retrieve it, record it, and assume legal title.
The relationship further deteriorated in April, 2000, culminating in the arrest of the plaintiff. He apparently went to Unit 121, late one CT Page 13468-bw night in April, the door had been bolted, but he got in and he either pushed or hit the defendant. She called the police and he was arrested. Here is where the story of what happened to the quitclaim deed executed on December 5, 1997, begins to unravel into two totally different scenarios.
The plaintiff claims that he went to the premises on April 24, 2000, subsequent to his arrest, to retrieve his personal belongings including his briefcase in which he believed the quitclaim deed resided. When he opened it, he found only the photocopy (plaintiff's exhibit A), being a portion of the quitclaim deed. He assumed the defendant had removed and destroyed it. He went to Attorney Foster Young's office to see if he had kept the original. He found out he did not. He immediately had them prepare a new deed which he claims he and his office manager, Jeanine Debrizzi, spoke to the defendant about on several occasions. He and she claim that the defendant agreed to sign it, that they made appointments at Attorney Young's office for her to sign it but she never did.
The defendant has a totally different version of the quitclaim's disappearance. To understand her version it is important to anchor the events as to time. Despite the downward spiraling of the relationship, the plaintiff wrote two letters to the defendant, one on May 1, 2000, and the second on May 12, 2000, expressing his love for her, asking her forgiveness for his conduct leading up to his arrest, and expressing his hope that the relationship could be resumed. (See plaintiff's exhibit D1 and D2.) It was in those letters that he described Unit 121 as "our home", which the defense has seized upon as indicating that he had gifted the condominium to her. It is of interest to note that the most he did was refer to it as "our home" not "her home."
Be that as it may, the defendant claims that Dr. Chinniah came to visit her some where between her receipt of the two letters in early May of 2000. He was obviously repentant and desirous of continuing the relationship. Both counsel and the court questioned her closely about that conversation. She admitted that she told him the relationship was over and she would not consider a reconciliation. Importantly, in a question posed by the court, she admitted that she was the one who introduced the subject of the quitclaim deed. She admitted that she said to the plaintiff essentially: if you want the quitclaim, take it; it's your prerogative. When the court asked her, "If he simply did that and recorded it, we wouldn't be here today.", and she replied, "Yes." Instead she claims the plaintiff retrieved the quitclaim deed, and in a rage said, "The home was always yours.", and ripped it up and said, "Now, we can get back together." The plaintiff denies this event ever took place. CT Page 13468-bx The court obviously does not know whether it did or did not, but for the purposes of this case, I am going to assume it did because I do not believe it affects its decision. What that conversation does demonstrate was that in the defendant's mind at that moment (1) the deed was still in existence, (2) that she offered it to the plaintiff, (3) that it was his prerogative to take it and record it and (4) if he did this case would not be here. In the court's mind, that confirms the fact that as of that moment she acknowledged that he was still the rightful owner of the premises and her status remained as a trustee.
The defendant claims, however, that by his action in tearing up the quitclaim deed the plaintiff had gifted the condominium to her. The court does not agree. The plaintiff's state of mind is clearly demonstrated in plaintiff's exhibit D1. He came to see the defendant that day in an effort to reconcile with her. His wishes were dashed. She raised the subject of the quitclaim deed and in a frenzy he destroyed it. Testimony supports his efforts immediately to get her to sign a new one. Under these circumstances, the court cannot conclude that there was any clear expression of donative intent sufficient to transfer by gift a property worth more than $255,000.
Events that took place thereafter support this conclusion. After the events of early May, 2000, the defendant, despite the fact of the existence of restraining orders, accompanied the plaintiff voluntarily to his Florida condominium for four days and slept with him. She never, as of that day or to this day, left Unit 121 at Summerfield. Their relationship ended in late June or early July of 2000.
There was testimony that the plaintiff gave the defendant a check for $5,500 on July 6, 2000, (plaintiff's exhibit 0) for the payment of taxes and common charges on Unit 121 and an additional $2,500 for her use as a security deposit on a new place to live. That evidence is not refuted. The defendant cashed the check. He gave her that money so that she could acquire other living arrangements.
What took place after July of 2000 is informative with reference to the defendant's state of mind concerning the property and the court's decision. The defendant, who was married to Carlos Garcia during her entire relationship with Dr. Chinniah, finally went to judgment in her divorce action on September 29, 2000. It appears that they held title together to premises that she conceded should become the sole property of her husband. In her affidavit (plaintiff's exhibit M) submitted to the court on that day, she denied that she owned any real estate even though this case had been initiated two months before. In a direct answer to a CT Page 13468-by question posed by the trial judge, she testified she was only renting Unit 121 at Summerfield and that she was paying $221.00 weekly as rent. In that same affidavit she listed the value of her automobile as $16,000 with a $12,000 lien when, in fact, there was no lien and, lastly, she listed her valuation of a Vanguard Mutual Fund account to be $4,000 when in fact it was worth at the time between $40,000 — $50,000. The plaintiff's testimony was to the effect that he paid all of the household expenses thus allowing the defendant to use her salary to accumulate a sizeable equity interest in the mutual fund. These absolute misstatements of fact constitute evidentiary and judicial admissions against the defendant's interest.
The court finds that a resulting trust was created on December 5, 1997, in favor of the plaintiff and that status never changed. Based on the relief requested, the court finds as to count one that the defendant is holding title to the condominium in trust for the plaintiff pursuant to a resulting trust and as to count two that a resulting trust was created on December 5, 1997, in favor of the plaintiff and still exists today.
The court finds, further, that ownership of the condominium rests in the plaintiff and the defendant is ordered to quitclaim Unit 121 at The Gardens of Summerfield to him.
GORMLEY, J.